Filed 3/6/14  Harrtis v. 3075 Wilshire CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CAROL HARRIS et al., | B223826 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC354847) |
| v. | |
| 3075 WILSHIRE, LLC et al., | |
| Defendants and Respondents. | |

　　　　APPEAL from a judgment of the Superior Court of Los Angeles County. Warren L. Ettinger, Judge.  Affirmed.

　　　　Law Offices of Robert Scott Shtofman and Robert Scott Shtofman for Plaintiffs and Appellants.

　　　　Archer Norris, W. Eric Blumhardt, Jonathan C. Bacon, Erin M. Gallagher; and Joseph V. Macha for Defendants and Respondents.

_____

Multiple plaintiffs (collectively Harris Parties) [1] appeal the defense judgment against them after the trial court entered a directed verdict in this premises liability action against 3075 Wilshire, LLC, Jamison Properties, Inc., David Young Lee and Hee-Sook Fung (collectively 3075 Parties). The Harris Parties contend, in part, that the motion for directed verdict should have been denied because there was substantial evidence that the 3075 Parties breached the applicable standard of care. Next, they assert, inter alia, that the trial court was divested of jurisdiction to rule on the 3075 Parties' motion for directed verdict due to Code of Civil Procedure sections 1008, 170.3 and 170.4.[2] After review, we affirm the judgment.

## FACTS

The 3075 Parties own and/or manage a nine-story office building (Borax Building) that was leased to the County of Los Angeles (County) at all relevant times. Titan Water Technology, Inc. (Titan) contracted with the 3075 Parties to maintain the Borax Building's water system.

In 2000, tests of the potable water system revealed the presence of more than 10 colony forming units per milliliter of Legionella bacteria. Johnny Timmons (Timmons) of Titan met and worked with Cal/OSHA, the 3075 Parties' property manager, the County's facility manager and the County's Public Health Department to devise a course of action. Pursuant to the jointly devised plan, Timmons super chlorinated the water supply. The Legionella bacteria was not eliminated, so Timmons performed a second super chlorination. In 2003, Legionella bacteria was once again detected. When Timmons performed a third super chlorination, he used over 50 parts per million of

---

[1]    The Harris Parties are the following appellants: Carol Harris, Paul Humbarger, Thelma Alexander, Benita Belardes, Richard Castro, Barbara Dean, Jacqueline Dean, Susanna Gonzalez, Gretchen Gygli, John Harris, Randolph Hardeman, Denise Jacobs, Kahn Johnson, Ruth Lenard, Deborah Lightfoot, Angie Mascarenas, Glenn Mills, Pedro Perez and Frederick Ross.

[2]    All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

chlorine. He left after 12 hours of testing and allowed others to reduce the level of chlorine back to one or two parts per million. On June 24, 2004, PathCon Laboratories issued a reported indicating that the water supply was contaminated with Legionella bacteria. In September 2004, Timmons performed a super chlorination following the procedure he had learned from his former employer, Aqua-Serv. Using that procedure, he flushed the water system with 50 parts per million of chlorine for 24 hours.

In three consolidated actions filed in 2006 and 2007,[3] the Harris Parties sued the 3075 Parties for negligence, premises liability, intentional infliction of emotional distress and violation of Business and Professions Code section 17200 et seq. It was alleged that the 3075 parties negligently failed to maintain the potable water supply and various areas of the Borax Building, failed to warn the Harris Parties of dangerous conditions, and failed to employ individuals with the requisite skill and experience to maintain a reasonably safe premises and environment. As a result, the Harris Parties became ill after being exposed to Legionella bacteria and mold.

Due to pretrial rulings, various documents were excluded from the trial, including the Harris Parties' medical records. Later, the trial court precluded the Harris Parties from calling their treating physicians as witnesses.

Matthew Freije (Freije) testified as an expert for the Harris Parties. He is a mechanical engineer specializing in Legionella bacteria and other water-borne pathogens. He was asked to assume that from 2000 to 2006, there were 10 colony forming units of Legionella bacteria in the potable water system of the Borax Building. Then he was asked what method of super chlorination he would recommend. Freije replied: "For the purposes of temporarily disinfecting the system, I would recommend either 50 parts per million chlorine, held for 24 hours, or 100 to 200 parts per million of chlorine held for at

---

[3]     The Harris Parties do not indicate when these actions were filed. The 3075 Parties inform us that two of the actions were filed on June 30, 2006. According to the 3075 Parties, the third action was commenced by Randolph Hardeman. No date is given, and the pleadings are not in the appellate record. However, the 3075 Parties inform us that a demurrer in the third action was sustained on August 9, 2007. Presumably, the third action was filed sometime in 2007.

least three hours." After a super chlorination, he opined that the water should be tested one or two weeks later. According to Freije, the recommended treatment would control the problem for one to three months.

After the close of the Harris Parties' case, the 3075 Parties moved for a nonsuit as to each cause of action. Nonsuit was granted as to intentional infliction of emotional distress. Subsequently, the trial court dismissed the statutory unfair business practices cause of action because the Harris Parties lacked standing and were not entitled to either a jury trial or individual damages. The case was submitted to the jury. After deliberating, the jurors reported that they were deadlocked. The trial court declared a mistrial.

On February 4, 2010, appellant Randolph Hardeman filed a motion to disqualify the trial court pursuant to section 170.6. The trial court ruled that the motion to disqualify was untimely and ordered it stricken from the record.[4]

The 3075 Parties moved for a directed verdict on that grounds that, inter alia, the Harris Parties did not present any expert testimony regarding the standard of care and whether it was breached. The motion for directed verdict came on for hearing and was granted. In the written ruling, the trial court stated that the Harris Parties "failed to present any expert testimony that would support their claims for negligence against [the 3075 Parties] by failing to establish that the following four factors occurred within the time frame of June 30, 2004[,] through December 7, 2006: [¶] (1) proof of a condition on the property that posed an unreasonable risk of harm; [¶] (2) actual or constructive notice on the part of [the 3075 Parties] of the condition of the property; [¶] (3) failure on the part of [the 3075 Parties] to remediate or warn of the condition; and [¶] (4) [the 3075 Parties'] breach was a substantial factor in the harm suffered by [the Harris Parties]."

Judgment was entered in favor of the 3075 Parties.

---

[4] The trial court denied the motion. But the Harris Parties represent that the trial court ordered the motion stricken. As we shall discuss, we construe the order as an order to strike rather than as a denial.

4

This timely appeal followed.[5]

## DISCUSSION

### I. The Directed Verdict.

According to the Harris Parties, the trial court should not have granted a directed verdict because there was sufficient evidence to support their negligence claim on the following theories: (1) the water system at the Borax Building was not properly maintained; (2) the 3075 Parties failed to warn the Harris Parties that the water system was contaminated with Legionella bacteria; and (3) the 3075 Parties negligently hired people to maintain the water system.

When reviewing a directed verdict against a plaintiff, we must reverse the corresponding judgment if the plaintiff presented substantial evidence supporting his or her causes of action. (*Conn v. Western Placer Unified School Dist.* (2010) 186 Cal.App.4th 1163, 1174.)

A. <u>Failure to maintain the water system</u>.

The Harris Parties argue that the trial court erred when it concluded that expert testimony was necessary to demonstrate the standard of care for maintaining the water system and breach. In the alternative, they argue that if expert testimony was required, the testimony of Freije was sufficient.[6]

---

[5]     The Harris Parties filed a motion to augment the record with a June 1, 2008, addendum to an order by the Hon. Enrique Romero (Ret.) as a discovery referee, an unfiled offer of proof for treating doctors, and a petition for writ of mandate. We deny the motion to augment.

[6]     The Harris Parties direct their argument at the negligence, premises liability and intentional infliction of emotional distress causes of action. However, the intentional infliction of emotional distress cause of action was dismissed pursuant to a nonsuit rather than a directed verdict. We therefore do not consider that cause of action. Because premises liability is a subspecies of negligence, our analysis focuses on whether there was substantial evidence of negligence. Further, we note that the Harris Parties concentrate their arguments on the issues pertaining to Legionella bacteria. We therefore do not consider their mold claims.

Negligence is actionable when it is shown that a defendant breached the standard of care and the breach was the legal cause of the resulting injury. (*Padilla v. Rodas* (2008) 160 Cal.App.4th 742, 752.) A commercial property owner owes patrons a duty to exercise reasonable care to keep the premises safe or warn patrons of a latent or concealed peril. (*Howard v. Omni Hotels Management Corp.* (2012) 203 Cal.App.4th 403, 431; *Edwards v. California Sports, Inc.* (1988) 206 Cal.App.3d 1284, 1288; *Rowland v. Christian* (1968) 69 Cal.2d 108, 119 [When an occupier of land is aware of a concealed condition that gives rise to "an unreasonable risk of harm to those coming in contact with it and is aware that a person on the premises is about to come in contact with it, the trier of fact can reasonably conclude that a failure to warn or to repair the condition constitutes negligence"].) A property owner must make reasonable inspections of the property, and the care required is commensurate with the risks involved. (*Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1205.)

"'The duty which a possessor of land owes to others to put and maintain it in reasonably safe condition is nondelegable. If an independent contractor, no matter how carefully selected, is employed to perform it, the possessor is answerable for harm caused by the negligent failure of his contractor to put or maintain the buildings and structures in reasonably safe condition, irrespective of whether the contractor's negligence lies in his incompetence, carelessness, inattention or delay.'" (*Brown v. George Pepperdine Foundation* (1943) 23 Cal.2d 256, 260.)

The initial question is whether the jury was competent to determine the standard of care owed to the Harris Parties by the 3075 Parties, and whether that standard of care was breached. If a matter is within the knowledge of experts but not the common knowledge of laymen, it is necessary for a plaintiff to introduce expert testimony in order to establish a prima facie case. (*Miller v. Los Angeles County Flood Control Dist.* (1973) 8 Cal.3d 689, 702–703 (*Miller*) [nonsuit was properly granted due to the lack of expert testimony establishing that the defendant failed to exercise due care when constructing a home].) "That is usually the case, for example, in medical malpractice actions." (*Allgoewer v. City of Tracy* (2012) 207 Cal.App.4th 755, 761.) But where "'the jury is just as

6

competent as the expert to consider and weigh the evidence and draw the necessary conclusions, then the need for expert testimony evaporates.' [Citation.]" (*People v. Torres* (1995) 33 Cal.App.4th 37, 47.)

If a trial court determines that expert testimony is necessary because a subject is beyond common experience, we will uphold that determination absent an abuse of discretion. (*People v. McDowell* (2012) 54 Cal.4th 395, 426 [concluding that "the trial court did not abuse its discretion in concluding the jury was capable of evaluating" an issue without expert testimony].)

In our view, the trial court did not abuse its discretion. We find *Miller* instructive. The plaintiffs lived in a home in Burbank. Events before and after its purchase increased the danger of flooding in the area during the rainy season. After a rainstorm, water, mud and debris traveled down a canyon and demolished the plaintiffs' home, causing personal injury, property damage and death. In the ensuing action, the survivors alleged that the homebuilder negligently designed and constructed the home. (*Miller*, *supra*, 8 Cal.3d at p. 693.) Due to their failure to offer expert testimony regarding negligence, the survivors lost the case. On appeal, the *Miller* court stated that it was "satisfied that it was not for nonexpert minds to determine whether [the builder] failed to exercise due care in the construction of the home. Building homes is a complicated activity. The average layman has neither training nor experience in the construction industry and ordinarily cannot determine whether a particular building has been built with the requisite skill and in accordance with the standards prescribed by law or prevailing in the industry." (*Id.* at pp. 702–703, fn. omitted.) No less so than construction, we conclude that the maintenance of a commercial water system and the eradication of Legionella bacteria in that system require specialized training and experience.

7

In light of the foregoing, we conclude that the trial court did not abuse its discretion when it required expert testimony.[7]  The next question is whether there was substantial evidence of negligence.

The Harris Parties argue:  Freije testified that "in order to eradicate the Legionella bacteria a concentration of chlorine at 50 parts per million chlorine should have been poured for 24 hours, or 100 to 200 parts per million of chlorine held for at least three hours[,] . . . , and that if properly done[,] the super chlorination method would generally control the Legionella [bacteria] from one to three months, usually two months.  [Citation.]  [¶]  Since none of this was done, there was substantial evidence . . . to support [the Harris Parties'] causes of action for negligence, premises liability and intentional infliction of emotional distress."

Timmons testified that in September 2004, he did a super chlorination for 24 hours using 50 parts per million of chlorine.  That is the exact procedure recommended by Freije.  Our analysis need not go further.

We note that there is no evidence one way or the other as to whether the 3075 Parties or their agents undertook any remediation after September 2004.  Why that is, neither of the parties say.  Thus, there is no evidence that the 3075 Parties did anything even ostensibly wrong after that time.[8]

---

[7]  The decision of the district court in *Flaherty v. Legum & Norman Realty, Inc.* (E.D. Va., Jan. 4, 2007, Civ. A. No. 1:05-1492) 2007 U.S. Lexis 95921 (*Flaherty*) lends support to our conclusion.  Like our case, *Flaherty* involved a negligence action based on exposure to Legionella bacteria in the water system of a building.  The district court held that the plaintiff's were required to produce expert testimony with respect to duty and breach.  (*Id*. at *41–43.)  Ultimately, the district court granted summary judgment after precluding the testimony of the plaintiff's experts because they were not qualified to establish the standard of care that a professional management company must exercise in operating and maintaining the water system of a condominium complex in Ocean City, Maryland; they were not qualified to establish the alleged breach of the standard of care; and they relied on inapplicable factual circumstances and materials to establish the standard of care and breach.  (*Id*. at *21–22, 61.)

[8]  The Harris Parties contend that when the trial court was striking a declaration submitted in opposition to the motion for directed verdict, the trial court referred to a

8

B.  Failure to warn; negligent hiring.

The Harris Parties inform us that "paragraph 90 of the [three] complaints alleged that [the 3075 Parties] failed to war[n] . . . , and were negligent by employing individuals without the requisite skill and experience to maintain a reasonably safe premises[, and] evidence was presented to support" these allegations.  Despite their representation, the Harris Parties did not cite to the supporting evidence that they claim was presented at trial.[9]  Therefore, the waiver doctrine applies.  "As a general rule, 'The reviewing court is not required to make an independent, unassisted study of the record in search of error or grounds to support the judgment.'  [Citations.]  It is the duty of counsel to refer the reviewing court to the portion of the record which supports appellant's contentions on appeal.  [Citation.]  If no citation 'is furnished on a particular point, the court may treat it as waived.'  [Citation.]"  (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115.)[10]

---

video of statements made by the Harris Parties' counsel about excluded evidence.  They urge us to conclude that it was improper for the trial court to refer to the video because it was not in the record.  But they do not contend that this was reversible error, so the point does not merit analysis.

[9]  For failure to warn evidence, the Harris Parties refer us to footnote 41 in the Opening Brief.  It states:  "Between 2004 and 2009, there was visible rust inside the [Borax Building]."  This footnote is insufficient to demonstrate that the 3075 Parties failed to warn.

[10]  Regarding the failure to warn, we recognize that in the Harris Parties' statement of facts, they advert to testimony from David Lee that in 2000, he did not personally notify the occupants of the Borax Building of the Legionella bacteria problem.  But 2000 is not within the relevant time frame.  Moreover, Lee testified that the County itself provided notice to the occupants.  This evidence does not establish a failure to warn between June 24, 2004, and December 7, 2006.

## II. Jurisdiction to Grant a Directed Verdict.

Citing section 1008,[11] the Harris Parties argue that the trial court lacked jurisdiction to grant a directed verdict because it improperly reconsidered and then reversed the partial denial of the motion for nonsuit. But the Harris Parties have not cited any case law deciding this issue in a manner favorable to their position. Moreover, the motion for directed verdict did not request reconsideration of the motion for nonsuit, and therefore it did not fall within section 1008, subdivision (a). Though the analysis of those two types of motions is the same, the motions are nonetheless distinguishable. For an example, a nonsuit is authorized after a plaintiff completes his or her opening statement or presents his or her evidence to a jury. (§ 581c, subd. (a).) Unless otherwise specified by the trial court, a motion for directed verdict is authorized only after a jury has heard the evidence of all parties. (§ 630, subd. (a).) Moreover, it has long been the rule that the "fact that a motion for a nonsuit has been denied does not prevent the court from subsequently directing a verdict for the defendants. [Citation.]" (*Fuchs v. Southern Pac. Co.* (1935) 5 Cal.App.2d 409, 412 (*Fuchs*); 7 Witkin, Cal. Proc. (5th ed. 2008) Trial, § 420, p. 495 ["A verdict may be directed despite the prior denial of a motion for nonsuit"].) The Harris Parties do not offer us a reason to depart from the rule set forth in *Fuchs*.

---

[11]    In relevant part, section 1008 provides: "(a) When an application for an order has been made to a judge, or to a court, and refused in whole or in part, or granted, or granted conditionally, or on terms, any party affected by the order may, within 10 days after service upon the party of written notice of entry of the order and based upon new or different facts, circumstances, or law, make application to the same judge or court that made the order, to reconsider the matter and modify, amend, or revoke the prior order. The party making the application shall state by affidavit what application was made before, when and to what judge, what order or decisions were made, and what new or different facts, circumstances, or law are claimed to be shown. [¶] . . . [¶] (e) This section specifies the court's jurisdiction with regard to applications for reconsideration of its orders and renewals of previous motions, and applies to all applications to reconsider any order of a judge or court, or for the renewal of a previous motion, whether the order deciding the previous matter or motion is interim or final. No application to reconsider any order or for the renewal of a previous motion may be considered by any judge or court unless made according to this section."

10

Next, the Harris Parties argue that the trial court was divested of jurisdiction once a motion to disqualify was filed pursuant to section 170.6,[12] and therefore it was not permitted to consider the motion for directed verdict. They rely on sections 170.3, subdivision (c)(5)[13] and 170.4, subdivisions (c)(1) and (d).[14] But the record discloses that the trial court denied the motion to disqualify as untimely before it directed a verdict. Section 170.4, subdivision (b) provides "[n]otwithstanding paragraph (5) of subdivision (c) of Section 170.3, if a statement of disqualification is untimely filed . . . , the trial judge against whom it was filed may order it stricken." We construe the order which denied the motion as untimely as an order striking it from the record. Notably, in their opposition to

---

[12]    Section 170.6, subdivision (a) permits a party to filed a motion to disqualify a judge on the grounds that he or she is prejudiced against a party or attorney appearing in the action.

[13]    Section 170.3, subdivision (c)(5) provides:  "A judge who refuses to recuse himself or herself shall not pass upon his or her own disqualification or upon the sufficiency in law, fact, or otherwise, of the statement of disqualification filed by a party. In that case, the question of disqualification shall be heard and determined by another judge agreed upon by all the parties who have appeared or, in the event they are unable to agree within five days of notification of the judge's answer, by a judge selected by the chairperson of the Judicial Council, or if the chairperson is unable to act, the vice chairperson. The clerk shall notify the executive officer of the Judicial Council of the need for a selection. The selection shall be made as expeditiously as possible. No challenge pursuant to this subdivision or Section 170.6 may be made against the judge selected to decide the question of disqualification."

[14]    Section 170.4, subdivision (c)(1) provides:  "If a statement of disqualification is filed after a trial or hearing has commenced by the start of voir dire, by the swearing of the first witness or by the submission of a motion for decision, the judge whose impartiality has been questioned may order the trial or hearing to continue, notwithstanding the filing of the statement of disqualification. The issue of disqualification shall be referred to another judge for decision as provided in subdivision (a) of Section 170.3, and if it is determined that the judge is disqualified, all orders and rulings of the judge found to be disqualified made after the filing of the statement shall be vacated."  Subdivision (d) provides:  "Except as provided in this section, a disqualified judge shall have no power to act in any proceeding after his or her disqualification or after the filing of a statement of disqualification until the question of his or her disqualification has been determined."

11

the motion for directed verdict, the Harris Parties stated that the "[trial court] has stricken the motion on grounds of untimeliness[.]"  Also, in the reply brief on appeal, the Harris Parties tell us, without a record citation, that on February 24, 2010, the trial court entered an order striking the motion.  The Harris Parties do not explain how sections 170.3, subdivision (c)(5) and 170.4, subdivisions (c)(1) and (d) divested the trial court of jurisdiction once it determined that the motion to disqualify was untimely and ordered it stricken.  Thus, there is no reason why the trial court could not grant the motion for directed verdict.

All of the foregoing is ultimately irrelevant because section 170.3, subdivision (d) provides:  "The determination of the question of the disqualification of a judge is not an appealable order and may be reviewed only by a writ of mandate from the appropriate court of appeal sought only by the parties to the proceeding.  The petition for the writ shall be filed and served within 10 days after service of written notice of entry of the court's order determining the question of disqualification.  If the notice of entry is served by mail, that time shall be extended as provided in subdivision (a) of Section 1013."  Thus, whether the trial court properly ordered the motion stricken is not an issue that we can entertain on appeal.

## III.  Other Issues are Moot.

The Harris Parties contend that they submitted sufficient evidence to prove the causation prong of negligence.  They also contend that the trial court erred when it excluded various documents and the testimony of treating physicians.  These issues are moot due to our conclusion that there is insufficient expert testimony regarding the standard of care and breach.

12

**DISPOSITION**

The judgment is affirmed.

The 3075 Parties shall recover their costs on appeal.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, J.
ASHMANN-GERST

We concur:

_____, P. J.
BOREN

_____, J.
CHAVEZ